# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### MARCH 2, 2010 Session

## STATE OF TENNESSEE v. OSCAR JOE GARCIA

### Direct Appeal from the Circuit Court for Madison County
### No. 08-283     Roy B. Morgan, Jr., Judge

---

### No. W2009-00592-CCA-R3-CD  - Filed March 29, 2010

---

Following a jury trial, the defendant, Oscar Joe Garcia, was convicted of four counts of facilitation of attempted second degree murder, four counts of facilitation of aggravated assault, one count of felony reckless endangerment, and one count of possession of a weapon with intent to employ during the commission of an offense. The trial court merged the facilitation of aggravated assault convictions into the facilitation of attempted second degree murder convictions and sentenced the defendant, as a Range I standard offender, to six years for each of the facilitation convictions, two years for the felony reckless endangerment conviction, and eleven months, twenty-nine days for the weapon conviction. The court ordered the six-year sentences to be served consecutively and the remaining sentences to be served concurrently, for a total effective sentence of twenty-four years. On appeal, the defendant argues that the trial court erred in imposing consecutive sentences and in denying his motion to correct and/or reduce his sentence. Based upon our review, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

David W. Camp, Jackson, Tennessee, for the appellant, Oscar Joe Garcia.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and Rolf Hazlehurst, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

Robin Winberry testified that during the late night hours and early morning hours of February 8-9, 2008, she was driving her vehicle, with Timmy Maness and Nicole Jones as passengers. They went to the Hermitage Apartments to see friends named Jessica and Beth Ann who began "yelling and screaming and jumping out." Maness and Jones did the same thing in response. After they picked up B.J. Henley, they returned to the Hermitage Apartments, where there were "a lot of people." Hearing a loud boom, which they believed to be a gunshot, they left again. Later in the evening, as they were traveling down Vann Drive, another car was behind them, and Winberry saw Ryan Lewis get out of it with a long, black gun. She "took off at the light," driving at an estimated speed of fifty miles per hour, and then saw Lewis' car come up beside her. Winberry described what happened next:

> BJ called out, "Look out the window," and I just remember like going on the steering wheel and covering my head, and then I guess I blacked out for a minute, and I remember getting out of – Timmy telling me to stop 'cause I had went across the street going towards the up ramp where you come down, and I remember getting out and asking Timmy to call my mom, and then I just sat there behind the car and Nicole sat there with me.

Winberry said that the last thing she remembered before being shot was seeing the defendant, whom she knew as AJ Alvarez, "out the window with that gun." She said she had "no doubt" that the defendant was the one who shot her. Winberry said that shotgun pellets struck her face, ears, and arm and that she still had pellets in her body: "Some of them came out of my mouth. They're still in my face, most of them are. All of them are still in my arm. Didn't have any surgery, nothing like that." On cross-examination, Winberry acknowledged that she had been drinking vodka and smoking marijuana the night she was shot. She said that her vehicle had tinted windows.

Dorothy[1] Williams testified that on February 8-9, 2008, she was a passenger in Winberry's vehicle. She said that after they drove by the Hermitage Apartments a second time, Ryan Lewis fired a shot toward their car, and they drove off, examined the car for damage, and then went to "get some weed." She said that, later in the evening, as they were driving around, she saw Lewis getting out of a vehicle, carrying a firearm, and coming toward their vehicle. Williams then described the shot being fired into the vehicle in which she was riding:

> A    [W]e were going down Vann Drive, and we pulled up to the light by the state trooper's office and that's when they pulled up beside us. I never seen AJ. I don't even know who he is. I seen Ryan Lewis the whole time. But I

---

[1]Williams testified that she also went by the name "Nicole."

know there was somebody else in the car, and Robin was like, "They got a gun," and I dunked my head, and that's when she got shot.

Q    And the car that the shot came from, what did it do?

A    They were still sitting there. Robin went on through the light. You know how the ramp comes down? She went on up through that. Her car was coming down, and we had to make her stop. Then we got out of the car, and then they pulled off and went that way, and we were screaming, "You shot Robin. You shot Robin," and then that's when I called 911.

On cross-examination, Williams said that she did not know who fired the shot into the car.

Timothy Maness testified that he was a passenger in Winberry's car on February 8-9, 2008. He said that, the second time they went by the Hermitage Apartments that night, they drove away after hearing a gunshot. He said that later, as they were stopped at a red light, "a car pulled up beside [them] and some guy was hanging out of the car with a gun," and Winberry was shot. He said that the person with the gun was not Ryan Lewis, who was driving the car. On cross-examination, Maness said that he and Winberry had been drinking vodka and smoking marijuana earlier that evening. He said that he and Winberry could have shared as many as five "blunts."

Billy Wayne Henley, Jr. testified that on February 8-9, 2008, he was riding in Winberry's car and, as they were leaving the Hermitage Apartments, he saw Ryan Lewis fire a shotgun at the car. He said that, later in the evening, Winberry was shot in the face, but he did not see who fired the shot.

Officer Steven Story of the Jackson Police Department testified that he was called to the scene of the shooting on February 9, 2008. At the scene, he found and tagged as evidence shotgun wadding which he recovered from the front seat of Winberry's vehicle.

Amy Oxley testified that she was an evidence technician and latent fingerprint examiner with the Jackson Police Department. She identified shotgun wadding which she collected from the rocker panel area of the passenger side of the victims' vehicle. She said that the shotgun blast had struck the vehicle just forward of the rear passenger door. Additionally, she removed shotgun pellets from both the driver's and passenger's seats of the vehicle.

Sergeant Tyreece Miller testified that he was an investigator with the Jackson Police Department. Sergeant Miller said that the defendant made no mention in his first statement

of the shooting. However, in his second statement, the defendant acknowledged firing the weapon at Winberry's automobile:

> It says, "I'm sorry for lying, get in more trouble. I never intended to shoot at the window. It was an accident. Sorry for everything. I had been drinking. Robin had never done anything to make me want to hurt her, and I never was trying to. I'm so sorry for everything. Hope someday I can apologize to her and everybody in the car for putting their life at risk. I'm dumb for even hanging out with Ryan 'cause the problems was . . . his with the car and I chose to make it mine for some dumb reason 'cause I was drunk and I know that I could have hurt her worse, but I never intended to really shoot anybody. It was an accident. Maybe I need some time to think about how dumb I am. Ryan asked me to shoot at the car 'cause he was driving. We hid the gun by a garbage can beside the Horizon. Ryan asked where it was so he could come back and get it. I went back and got it. Chris King has it."

Sergeant Miller said that, based upon the statement, he contacted Chris King and asked him to bring the shotgun to the Jackson Police Department, which he did. The defendant later signed a photograph of King, writing, "This is Chris King, Amanda's nephew's friend. He took me to get the gun and he has it now."

Sergeant Miller testified as to what was shown in the photographs he took of Winberry's injuries:

> The first one is a picture of the side of her face and her left arm. The second one is a close-up of her left arm. Close-up of her face. Another close-up of her left arm. A close-up of the left side of her face behind her ear. You can see where pellets impacted her ear and behind her ear. The next one is just a photograph of the same. The next one is a photograph of just a face shot. The next one is a close-up of where the pellet impacted her nose. The next one is where pellets were under her bottom lip and on her left cheek. The next one is just a duplicate of the previous. Next is a close-up of the left ear, left cheek. And the same thing. Another close-up of her left arm. The next one is her right finger where a pellet impacted her right finger. And the next one is just a close-up of the right finger. The next one is, she's pulling her top lip up and you can see where a pellet is coming through. It entered here and you can see it's – inside her mouth you can see it there. The next one is someone has lifted her hair up. You can see where some of it impacted just above her left ear. And the next one is the same. You can see where it impacted her scalp above the left ear.

-4-

Sergeant Miller said that, during an unrecorded interview, the defendant admitted that he fired the shot that hit Winberry. During cross-examination, Sergeant Miller acknowledged that, in his written statements, the defendant did not admit he shot Winberry. He also acknowledged that no fingerprints were lifted from the shotgun and that no testing for gunshot residue was performed on the defendant.

Chris King testified that on the day of the shooting he gave the defendant a ride home from his girlfriend's house, and the defendant asked him to "stop at the Horizon off F.E. Wright" where the defendant retrieved a shotgun.[2] King asked the defendant what he was going to do with the gun and if he "could get it." He said that he got the gun from the defendant the day before Sergeant Miller called him and that he carried the gun to the police station the day after the shooting.

The twenty-year-old defendant testified that on the evening of February 8, 2008, he, Blake Bailey, Adam Moore, and Kyle Ross went to the Hermitage Apartments in Ross's car. Ryan Lewis, who was alone, followed behind them in another car. At the apartment complex, the defendant saw Jessica, Beth Ann, and others outside and described what happened next: "[S]ome arguments were made between Jessica, . . ., in the car, and . . . I didn't know anything about Lewis' house being shot up or anything about that, but I heard a shot being fired, and it was . . . from Lewis at [Robin Winberry's] car."

The defendant said that he and Bailey then got back in the car with Ross and went to Kroger Lynnwood. Because Ross could not give them a ride home, the defendant called Lewis who came and picked up him and Bailey. Lewis drove Bailey home and then proceeded to drive the defendant to his girlfriend's house. After they got onto the bypass headed toward Interstate 40, Lewis saw Winberry's car pull up beside them. They stopped at the traffic light at Vann Drive and the exit ramp. Lewis then got out of the car, retrieved a shotgun from the backseat, loaded it, cocked it, and walked toward Winberry's car. Lewis, who was "enraged," returned to the car with the gun and chased after Winberry's car.

The defendant said that, when they caught up with Winberry's car, Lewis pulled up alongside it, rolled down the power window on the passenger's side where the defendant was sitting, and asked the defendant to shoot at the car. Lewis pointed the gun out the defendant's window toward Winberry's car, the defendant grabbed the barrel of the gun, and it discharged. The defendant said that Lewis' hand, not his, was on the trigger when the gun discharged. The defendant said that he noticed a window had been hit on Winberry's car.

---

[2]King also testified that he first saw the shotgun at the defendant's house. When asked to clarify his testimony about seeing the gun at the Horizon, King said, "Well I didn't see it. I mean, he had something."

He said that Lewis immediately ran the traffic light and got onto the interstate headed toward Nashville. Lewis then exited the interstate by Pringle Park and drove to the Horizon where they hid the gun. The defendant said he helped Lewis hide the gun because "the shot came from my window, and I knew that I'd be looked at like I fired the shot." The defendant then went to his girlfriend's house and was there about twenty minutes before Chris King arrived. He then went back to the Horizon to get the gun to "cover up [his] foot tracks." He gave the gun to King because he was afraid of "being in trouble for these charges and possibly Lewis . . . getting the gun and doing something else with it." He said that he never intended for anyone to get shot when he grabbed the gun and that he was only "trying to diffuse the situation."

On cross-examination, the defendant acknowledged that he also went by the name of AJ Alvarez. The defendant admitted that he had lied to Sergeant Miller "over and over again" and that both his girlfriend and his mother had lied for him. The defendant maintained that the shooting was accidental but acknowledged that he and Lewis did not stop to check on the victims or call 9-1-1.

## ANALYSIS

On appeal, the defendant argues both that the trial court erred in imposing consecutive sentences and in denying the defendant's motion for a reduction of his sentence. We will review these issues.

## I. Consecutive Sentencing

The defendant argues that the fact he received an effective sentence of twenty-four years, while his co-defendant was sentenced to fifteen years, violates the holding of State v. David Lamar Hayes, No. M2002-01331-CCA-R3-CD, 2004 WL 1778478 (Tenn. Crim. App. Aug. 9, 2004), perm. to appeal denied (Tenn. May 23, 2005), as well as the dictates of Tennessee Code Annotated section 40-35-103.

In sentencing the defendant, the court found as follows:

> The Court's considered the entire record in this case. I do recall the testimony and exhibits from the trial of the matter and consider the presentence report, the victim's statement and the bills that have been submitted today. I note there are no mitigating factors that have been filed on behalf of the [d]efendant, and that the Court considers the youth of the [d]efendant as a mitigating factor but nothing further could be found as the Court reviewed in my own mind about mitigation.

As to enhancing factors, I have reviewed those enhancing factors that have been filed by the State and note that the Court does find that there's a history sufficient beyond that to establish the range, and he is a Range I Offender, and enhancing factors can be considered.

There was more than one victim involved in this case. It was a vehicle that contained several victims, and, of course, a finding of guilty relating to four victims in the case.

The Court also considers this [d]efendant has failed to comply with conditions in the past, and that's already been alluded to in that he was on probation at the time of this offense. The [d]efendant committed crimes that were a high risk to human life. The [d]efendant, and this is very important in the Court's consideration, committed these serious offenses for which he has been found guilty while he was released on probation at the time, that being probation I believe out of General Sessions Court.

Those are certainly proper factors for the Court to consider, and I wanted to note each of those. No one factor is – I'm not emphasizing how much more weight, but the last factor I mentioned regarding the offense occurring while released on probation is certainly an important factor.

The court made additional findings in determining that certain of the sentences should be served consecutively:

Now, as to the issue of consecutive in this case, . . ., I do find considering what is set forth in the statute on the issue of consecutive sentencing that the [d]efendant does have a criminal record. I can consider this record according to that case authority just submitted by the State. He does have a criminal record that involves prior offenses that can be considered by the Court. I get concerned as to whether it's considered extensive. If I can consider this particular case to be factor, I certainly think it's extensive because this case carries quite a few convictions. I am considering those which have been unchallenged in the presentence report, and when I consider those in conjunction with this particular case for which he's now been convicted of 10 separate counts, I think it qualifies for purposes of the statute under I believe 40-35-115 for extensive, and that can be a factor in considering consecutive.

He has displayed, and this is another factor, disregard for human life in

-7-

this particular case. The acts committed which displayed a high disregard, a high risk to human life, and I think that's a factor in this case just considering the facts of the case and the proof that was submitted to the jury.

And again, one of the major factors of consideration is that this [d]efendant with his prior criminal history was on probation at the time the offense was committed, and that is a factor that weighs against him in deciding consecutive sentencing.

I find that confinement is necessary for an extended period of time to protect society from the [d]efendant because of his unwillingness to comply and follow the rules when placed and given the opportunity such as on probation in the past, and that is a factor that weighs with the Court today in deciding consecutive sentenc[ing].

So in making those findings, I think consecutive sentenc[ing] is going to be appropriate for consideration. It's just to what extent should consecutive sentencing lie in this case. Noting previously the mergers, I find under the facts of this case that it would be appropriate that Counts 1, 3, 5 and 7 be consecutive with each other and that this total effective sentence with Counts 9 and 10 concurrent would be a total effective sentence of 24 years as a Range I Offender. He would be eligible for release at 30 percent, but there is no automatic release time under the circumstances.

The defendant does not contest any of these findings by the trial court, only the court's setting of an effective twenty-four-year sentence, which, in the defendant's view, creates an illegal disparity when compared with the fifteen-year sentence imposed on his co-defendant. We will review this claim.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2006). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses, (h) any statements made by the accused in his own behalf, and (i) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2006); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2006), Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

Tennessee Code Annotated section 40-35-115(b) provides that it is within the trial court's discretion to impose consecutive sentencing if it finds by a preponderance of the evidence that any one of a number of criteria applies, including that "[t]he defendant is an offender whose record of criminal activity is extensive," and "[t]he defendant is sentenced for an offense committed while on probation[.]" Tenn. Code Ann. § 40-35-115(b)(2) & (6) (2006). The defendant does not contest the application of these factors, and we conclude that the record supports the imposition of consecutive sentencing.

Given the fact of the defendant's prior convictions and his being on probation at the time of the commission of the offenses which are the basis for this appeal, we conclude that the trial court did not abuse its discretion in sentencing the defendant.

## II. Motion for Correction or Reduction of Sentence

The defendant also argues that the trial court erred in denying his motion, pursuant to Tennessee Rule of Criminal Procedure 35, for a correction or reduction of his sentence. His arguments in this regard are that, even though he went to trial, he should have received the same sentence as his co-defendant, who pled guilty. We respectfully disagree.

In State v. Mann, 959 S.W.2d 503 (Tenn. 1997), our supreme court set out the differing treatment which could be afforded to those defendants who plead guilty:

> A defendant who pleads guilty extends a substantial benefit to the criminal justice system, and in exchange, the State is entitled to extend a less harsh sentence than might otherwise be given. Likewise, if a plea offer is rejected, the State may prosecute the defendant to the fullest extent possible and seek whatever punishment is appropriate under the law.

Id. at 509 (citations omitted).

The defendant's argument that he should have received the same sentence as his co-defendant overlooks several critical facts. Although the defendant testified at trial to the contrary, Winberry testified that it was the defendant who fired the shotgun from the passenger seat of his vehicle into her vehicle and that his co-defendant was driving. Additionally, the defendant cannot expect the same treatment as that given his co-defendant because the co-defendant pled guilty. We agree with the State that the holding in David Lamar Hayes, 2004 WL 1778478, does not benefit the defendant. In that case, the defendant, who was thirty-seven years of age, was sentenced to an effective sentence of 220 years, to be served at 100% for thirteen counts of rape of a child and seven counts of rape. Id. at *10. This court reduced the effective sentence to sixty-six years, explaining that "we believe this particular effective sentence of 220 years far exceeds that allowed under our general sentencing principles." Id.

This defendant received an effective sentence of twenty-four years for discharging a shotgun into an automobile occupied by four persons, with pellets striking one victim in the arm and face. We conclude, as did the trial court, that a sentence of twenty-four years is within the sentencing principles.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE